IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Gavin Vachon Jones, ) | |
| ) | Civil Action No. 3:06-0788-TLW-JRM |
| Petitioner, ) | |
| ) | |
| vs. ) | |
| ) | |
| ) | |
| Stan Burt, Warden of Lieber ) | **REPORT AND RECOMMENDATION** |
| Correctional Institution and Attorney ) | |
| General of the State of South Carolina, ) | |
| ) | |
| Respondents. ) | |
| ) | |

Petitioner, Gavin Vachon Jones ("Jones'), is an inmate at the South Carolina Department of Corrections serving a sentence of life imprisonment for murder. He filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on March 14, 2006.[1] The case was automatically referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Rule 73.02 (B)(2)(c), DSC. Respondents filed a motion for summary judgment, supported by copies of portions of the state court record, on June 15, 2006. Because petitioner is proceeding pro se, an order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued on June 26, 2006, advising petitioner of his responsibility to properly respond to the motion for summary judgment. Petitioner filed his response on June 28, 2006. Jones filed a motion for summary judgment on June 28, 2006. Respondents filed a response on June 29, 2006, and Jones filed a reply on July 6, 2006.

---

[1] This is the Houston v. Lack, 487 U.S. 266 (1988) "delivery" date. See order filed March 8, 2006.

**Procedural History**

Larry Stanley was murdered at his place of business, the Uptown Lounge in Anderson, South Carolina in the early morning hours of June 19. 1998. Jones, who had worked briefly for Stanley, was arrested ten to twelve days later on another charge.[2] (App. 732). He was arrested for Stanley's murder on September 24, 1998. He was represented at trial by David Stoddard. The jury returned a verdict of guilty, admittedly based solely on circumstantial evidence, on July 15, 1999. Jones was sentenced to life imprisonment without parole.

An <u>Anders</u>[3] brief was filed on Jones' behalf through the South Carolina Office of Appellate Defense. (App. 552). Jones filed a pro se brief. (App. 562). The appeal was dismissed by the South Carolina Court of Appeals on July 11, 2001. A petition for rehearing was denied.

Jones filed an application for post-conviction relief ("PCR") on June 6, 2002. (App. 612). An evidentiary hearing was held on December 15, 2004. (App. 631). Jones proceeded pro se with "standby counsel." An order of dismissal was filed on January 21, 2005. (App. 716). A petition for writ of certiorari was filed through the South Carolina office of Appellate Defense. The petition was denied by order of the South Carolina Supreme Court dated November 16, 2005.

**Grounds for Relief**

Jones asserts that he is entitled to a writ of habeas corpus on the following grounds:

> Ground One: Lower Court erred in failing to grant a directed verdict were evidence was constitutionally insufficient.
>
> Ground Two: Counsel was constitutionally ineffective for failing to bring fourth (sic) evidence of third party guilt.

---

[2]This charge was later dismissed.

[3]<u>Anders v. California</u>, 386 U.S. 738 (1967)

>Ground Three: Counsel was constitutionally ineffective for failing to ask for an alibi charge.
>
>Ground Four: Counsel was constitutionally ineffective for not pointing out to jury that unseemingly stain was not blood.

Respondents concede that Jones has properly exhausted his claims and that his petition is timely.

## **Discussion**

Since Jones filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254(d), as amended. Lindh v. Murphy, 521 U.S. 320 (1997); Breard v. Pruett, 134 F.3d 615 (4th Cir.), *cert. denied,* 521 U.S. 371 (1998) and Green v. French, 143 F.3d 865 (4th Cir. 1998), *cert. denied*, 525 U.S. 1090 (1999). That statute now reads:

>An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States Supreme Court has addressed procedure under § 2254(d). See Williams v. Taylor, 529 U.S. 362 (2000). In considering a state court's interpretation of federal law, this court must separately analyze the "contrary to" and "unreasonable application" phrases of § 2254(d)(1).

>A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases .... A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable

3

> from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Court's] precedent.

> \* \* \*

> [A] state-court decision involves an unreasonable application of [the Supreme] Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of [the] Court's precedent if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Id. at 1519-20. Ultimately, a federal habeas court must determine whether "the state court's application of clearly established federal law was objectively unreasonable." Id. at 1521.

1.  Sufficiency of Evidence

Jones argued in his Anders brief on direct appeal that the trial court erred in failing to grant a directed verdict based on insufficient evidence. (App. 552). In his brief, he argued only state precedent. The appeal was dismissed by the South Carolina Court of Appeals. Jones now argues that the evidence was "constitutionally insufficient."

A habeas petitioner's claim that he was convicted on insufficient evidence is cognizable as a due process violation. Jackson v. Virginia, 443 U.S. 307 (1979), Schulp v. Delo, 513 U.S. 298 (1995). The due process clause is not violated if, viewing the evidence in the light most favorable to the State and giving the prosecution the benefit of all reasonable inferences, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Evans-Smith v. Taylor, 19 F.3d 899, 905 (4th Cir. 1994). This court is required to review and evaluate all of the evidence presented at trial in assessing such a claim. Wright v. West, 505 U.S. 277 (1992). Completely

circumstantial evidence may be adequate to support a conviction. Stamper v. Munice, 944 F.2d 170 (4th Cir. 1991).

After reviewing the record, the undersigned concludes that the evidence, while circumstantial, was constitutionally sufficient. No forensic evidence was discovered linking Jones to the murder. The State offered testimony establishing motive, opportunity, ability and knowledge of the crime by Jones. The prosecution did a commendable job of tracing Jones' footprints on the morning of June 19, 1998.

The first witness called by the State was Mary Stephens, the manager of the Uptown Lounge. She established that the victim was the owner of the business which was a restaurant/bar with video poker machines. It was the victim's habit to work in the afternoons until closing at 10:00 p.m. The video poker receipts were kept in a red zippered bag which accumulated during the week. Eddie Loftis of Collins Entertainment testified that he and the victim would split the week's receipts each Friday morning. This would usually be thousands of dollars in bills of one hundred, fifty, and twenty dollars.

Prior to June 18, 1998, Jones was unemployed. On June 17, job services (the State Employment Office) referred Jones to the Uptown Lounge. (App. 174). Jones began working as a bartender on Thursday June 18 at 4:00 p.m. He worked until 8:00 p.m. and was paid. Jones left around 8:15 to 8:30. (App. 161-62).

After closing at 10:00 p.m. the victim, Jerry Meeks (a friend of the victim) and Gary Spears (bartender) stayed to socialize and play the video poker machines. The victim used the money from the red bag, i.e., the poker machine receipts. Around midnight, Spears answered a phone call from Jones and within a few minutes Jones returned to the Uptown Lounge. Meeks let him in and fixed

him a drink. The red bag was on the bar in plain view. It contained such an amount of cash that it was difficult to zip. Jones attempted to borrow some money from the victim and they began to quarrel. The victim told Jones "that the best thing for you to do is get out, don't come back. You're fired." (App. 165). As Jones was leaving, he told Meeks, "Man, all I wanted to do is borrow $8." (App. 156). At approximately 2:00 a.m., Meeks and Spears left. The victim locked the door behind them. (App. 156-57).

The State was able to present evidence of Jones' activities between the time he left the Uptown Lounge around 8:30 p.m. on June 18 and his return around midnight. At approximately 9:00 p.m., Jones appeared at the home of Douglas Williford, a friend of his parents. They left to get a beer. Williford bought the beer. They returned to Williford's residence, and Jones made several phone calls, one to someone named Gary. Jones then left and returned to the Uptown Lounge. As discussed below, Jones was to return to Williford's residence two more times on the early morning of June 19.

Jones left the Uptown Lounge after midnight after trying to borrow money from the victim and being terminated. Jackie Sanders, aka "Beth," testified she was at the house of Dale Byrd, and after midnight Jones arrived. Sanders testified that she smoked crack cocaine with Jones, Byrd and another man for the next several hours. Jones left and returned several times. Later Sanders, Jones and the other man went to an abandoned house. When they left they went back to Williford's house. It was approximately 3:00 a.m. on June 19. (App. 178, 196). Williford refused to let them in because of the hour. Sanders and Jones then went to the residence of Alonzo Price, aka "Yummy," where they "talked for a while and partied for a while." (App. 190). Jones left and returned on two

6

occasions. Eventually, Jones said he needed to go get some more money. (App. 191). Sanders stayed with Price. Jones was gone for one and a half to two hours. (Id.).

Shortly after 5:00 a.m., Ralph Cummings, an Anderson police officer, encountered Jones about a block from, and walking toward, the Uptown Lounge. Stephens found the victim inside the Uptown Lounge about 3 hours alter. (App 97). There was evidence of forced entry. (App. 108). No money was found inside the Uptown Lounge. (App. 109). The autopsy showed that the victim and been beaten to death. The pathologist testified "(t)his was a rapid or blitzkrieg, sudden attack with a large amount of violent force followed by a large amount of weight or force which shoved him and imprinted him against the structures in the floor." (App. 314). Death was not instantaneous. (App. 315). The pathologist opined that the blows to the victim could have been made by the hands or feet. (App. 315-16). The State presented evidence that Jones was proficient in martial arts. (App. 248).

At approximately 6:00 a.m., Jones appeared at Williford's house for the final time. He was alone. Jones asked Williford for a change of clothes, and he gave Jones a T-shirt and pair of shorts. Jones gave Williford his shirt and pants and asked him to wash them for him, which he did. The shirt was torn and damp with perspiration.[4] Williford later gave Jones' washed clothing to the police. Jones was only at Williford's for about 10 minutes on this occasion. (App. 179-84).

After leaving Williford's home, Jones returned to Price's house and rejoined Price and Sanders. Jones asked Sanders if she had identification so they could get a hotel room. She told him that she did not. She asked him if he had gotten the money. Jones "patted his pocket and said 'yeah.'" (App. 193). Price testified that when Jones returned he (Jones) was "anxious to get

---

[4]In a pretrial statement to the police, Williford described the shirt as soaking wet.

7

somewhere." (App. 233). Jones offered Price $60 to $70 to drive him somewhere,[5] but Price refused. (Id.). Jones then left alone.

Jones had no access to a vehicle during the events described above. Early on the investigation began to focus on Jones. A neighborhood canvas was conducted in an attempt to locate him for questioning. Taxi records were negative. (App. 330-31). The State introduced a map into evidence showing that all the locations visited by Jones were in close proximity, within relatively easy walking distance. A photograph was introduced showing, in conjunction with the map, that a railroad tunnel was between the Uptown Lounge and Williford's house. (App. 340-46).

Jones next appeared at the house of a drug dealer, Josh Stewart, and his girlfriend, Shirley Rainey. Although the time is not entirely clear, Jones arrived after midnight early on the morning of June 20. He stayed until about daylight. While there, Jones appeared agitated and kept looking out the window. (App. 273, 290). He said he had been, or needed to go, to the hospital to check on someone. At one point, Jones asked Rainey to telephone his wife to come to him but then changed his mind explaining that the police might be watching his house and could follow his wife there. (App. 290). Jones also said that he had gotten into an argument with a man over $8. (App. 368, 291) and that he had taken the man's money because the man "talked junk to him." (App. 292). Jones told Stewart and Rainey that after the incident he came through a tunnel. (App. 272, 292). Jones offered Rainey $100 as a birthday present.[6] (Id.). Jones gave Stewart a grocery bag of money (approximately $4800) to "hold" for him. (App. 272). Jones returned the next day, retrieved the money and gave Stewart $100. (App. 276-77).

---

[5]Jones did not say where he wanted to go.

[6]Rainey's birth date is June 20.

8

The State presented several other witnesses who testified that Jones had money, drugs, and new clothing after the murder. Apparently, Jones paid a woman to rent her automobile. An arrest warrant was issued for grand larceny of a vehicle. The vehicle was spotted in Pendleton, South Carolina. Jones was arrested on June 28 at the apartment of Amos Galloway. (App. 252, 362-63). Jones asked Galloway to tell the police he was not there. (App. 252). Jones was questioned about the homicide but released after the grand larceny charge was dropped.

After Jones was released, he made further statements indicating culpability. He told Rainey, "(y)ou know about what happened, don't you?...You know, I could get the electric chair for that." (App. 294-95). He also told Sandra Ashley to provide false alibi for him. (App. 249-50). Jones was arrested for the murder of Larry Stanley on September 24, 1998.

The undersigned concludes based on this evidence a rational jury could fine Jones guilty beyond a reasonable doubt.

B.  Ineffective Assistance of Counsel

Jones asserts that his trial attorney was ineffective for failing: (1) to present evidence of third party guilt; (2) to request an alibi instruction; and (3) to argue strongly that a stain on the shirt entered into evidence was not blood.

The Sixth Amendment to the United States Constitution guarantees a defendant the right to effective assistance of counsel in a criminal prosecution. McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970). In the case of Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court set forth two factors that must be considered in evaluating claims for ineffective assistance of counsel. A petitioner must first show that his counsel committed error. If an error can

be shown, the court must consider whether the commission of an error resulted in prejudice to the defendant.

To meet the first requirement, "[t]he defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Turner v. Bass, 753 F.2d 342, 348 (4th Cir. 1985) quoting Strickland, *reversed on other grounds*, 476 U.S. 28 (1986). In meeting the second prong of the inquiry, a complaining defendant must show that he was prejudiced before being entitled to reversal. Strickland requires that:

> [T]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
>
> * * *
>
> [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. . . the court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. (Emphasis added).

Strickland at 694-95.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal habeas court must determine whether the state court's decision "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The court's analysis should center on whether the state courts properly applied the Strickland test. See Williams v. Taylor, 529 U.S. 362 (2000).

("Strickland test provides sufficient guidance for resolving virtually all ineffective assistance of counsel claims.")

        1.        Third Party Guilt

The Compulsory Process Clause of the Sixth Amendment guarantees a criminal defendant the right to secure attendance and testimony of witnesses whose testimony is both favorable and material to the defense. Washington v. Texas, 388 U.S. 14 (1967). The rule extends to documentary evidence. In re Martin Marietta Corp., 856 F.2d 619 (4th Cir. 1988), *cert. denied*, 490 U.S. 1011 (1989). States may, of course, develop rules to exclude evidence in criminal trials as long as those rules are not arbitrary and prevent "a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986). "[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged...[Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial." Holmes v. South Carolina, ___ U.S. ___, 126 S.Ct. 1727 (2006) quoting 40A Am.Jur.2d, Homicide § 286, pp. 136-138 (1999). See also, State v. Gregory, 198 S.C. 98, 16 S.E.2d 532 (1941).

Prior to trial, the State moved for an in camera hearing should the defense attempt to present evidence of third party guilt. (App. 60-61). No such evidence was presented. In his PCR, Jones asserted that his trial attorney was ineffective because he failed to present evidence that another individual, Sam Mackey, Sr., was involved in the murder. (App. 621). Jones made a presentation of this issue during the evidentiary hearing, but presented no admissible evidence. (App. 654-57). Counsel testified that there was speculation and rumors concerning Mackey, but he could not find

11

any admissible evidence. (App. 690-94). The PCR court concluded "that there was no viable evidence of third party guilt to present in this case." (App. 721).

Jones did not present any witnesses or documentary evidence to implicate Mackey at the PCR hearing. Instead, he merely testified of a rumor that Mackey was involved. The PCR court correctly rejected this claim.

        2.        Alibi Instruction

Jones asserts his trial counsel was ineffective for failing to request an alibi charge. This claim was rejected by the PCR court.

Under South Carolina law, alibi is not an affirmative defense which must be provided by the defendant by a preponderance of the evidence. The State has the burden of proving the defendant's presence and that the defendant committed the crime. State v. Deschamps, 134 S.C. 179, 131 S.E.2d 420 (1926). "A charge on the defense of alibi is not required when an accused person merely denies committing the criminal act. Alibi means elsewhere, and the charge should be given when the accused submits that he could not have performed the criminal act because he was in another place at the time of the commission." State v. robbins, 275 S.C. 373, 271 S.E.2d 319 (1980), citing 21 Am. Jur. 2d Criminal Law § 136. In other words, to be entitled to an alibi instruction, the record must contain evidence that the defendant was not at the crime scene, but was, in fact, at some other location when the crime was committed.

Jones appears to argue that he was entitled to an alibi instruction because there were no eyewitnesses and no forensic evidence tied him to the crime scene. As discussed above, this is not the law of South Carolina. Jones did not testify at trial and the record contains no specific evidence

that he was elsewhere when the murder occurred. Since Jones was not entitled to an alibi instruction under South Carolina law, there was no attorney error.

    3.  Blood Stain

    The shirt Jones was wearing at the time of the murder was recovered from Douglas Williford. It had been washed but there was a stain on it. The shirt was processed by SLED. At trial, the examiner testified that there was no blood on the shirt. (App. 393). This testimony was reinforced by counsel on cross examination. (App. 395). During summation in which counsel argued reasonable doubt based in part on the lack of forensic evidence, Jones' trial attorney specifically argued that there was no blood on the shirt. (App. 514).

At the PCR hearing, Jones appears to have argued that his attorney should have objected to the introduction of the shirt, as well as all the other evidence collected from the crime scene, because it had no blood on it. (App. 654). Jones questioned his trial attorney on the issue, and counsel explained that there was no objection he could have raised to keep the shirt and other items from being admitted into evidence. (App. 686-88). He added that "shortly after closing arguments were over, I was ...kicking myself a little bit that I did not highlight more forcefully that that's not blood on that shirt. In other words, I had regretted after the trial was over that I didn't hold that shirt up to the SLED agent and say, by the way, that is not blood, is it officer?" (App. 688-89).

The PCR court found that under South Carolina evidentiary standards:

> (t)he State's presentation of its crime scene investigation procedure was proper and unobjectionable. Further, the presentation and the corresponding lack of direct evidence that resulted therefrom actually aided the applicant's case. The evidence at trial revealed that the shirt that trial counsel brought out had no blood on it, therefore trial counsel rightly brought the shirt to the jury's attention.

(App. 721). The introduction of evidence at trial is a question of state law and procedure. Since the shirt was clearly admissible into evidence, trial counsel was not ineffective for failing to object. Trial counsel second guessed his cross examination of the SLED agent. However, there was no error because the cross-examination did reiterate that there was no blood on the shirt, and counsel argued this fact to the jury.

## **Conclusion**

Based on a review of the record, it is recommended that respondents' motion for summary judgment be granted, and that petitioner's motion for summary judgment be denied.

                                              Respectfully submitted,

                                              s/Joseph R. McCrorey
                                              United States Magistrate Judge

February 6, 2007
Columbia, South Carolina

**The parties' attention is directed to the important information on the attached notice.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).